ELMER E. HENAMAN, Administrator, Appellant, et al., Appellees, v. CITIZENS SAVINGS BANK OF FOSTORIA et al., Appellees.

**EXECUTORS AND ADMINISTRATORS:** Executor De Son Tort—Evidence. Evidence reviewed, and held insufficient to establish an intermeddling by defendants with the property of a deceased, and insufficient to establish a conspiracy to defraud the widow of deceased.

Headnote 1:   12 C. J. p. 639; 24 C. J. p. 1223 (Anno.)

*Appeal from Clay District Court.*—JAMES DE LAND, Judge.

APRIL 7, 1925.

ACTION by an administrator, to recover funds alleged to belong to the estate of Philip Henaman, deceased. Decree dismissing the petition as to a portion of the claim. From the adverse ruling of the court, the plaintiff appeals.—*Affirmed.*

*William S. Johnston* and *Helsell & Helsell,* for appellant.

*Heald, Cook & Heald* and *E. A. & W. H. Morling,* for Citizens Savings Bank and V. Clark.

*Cornwall & Cornwall,* for Phoebe Henaman.

*Buck & Kirkpatrick,* for D. U. Beving.

*Heald, Cook & Heald,* for John M. Lidman, Sheriff.

STEVENS, J.—Philip Henaman died intestate at Fostoria, Iowa, February 14, 1920, leaving surviving him Phoebe Henaman, his widow, and eleven children, four of whom were minors. No administrator was appointed for his estate until June 19, 1922, when his son, Elmer E. Henaman, appellant, was appointed as such administrator. Philip Henaman resided in or near Fostoria, in Clay County, for more than twenty years. At the time of his death, the members of his family, except appellant and Cyrus B., sons, resided in the immediate vicinity of Fostoria.

Prior to January 16, 1919, and on that date, Philip Henaman had $8,000 on deposit in the Citizens Savings Bank, appellee herein, evidenced by two certificates of $4,000 each. On the above date, the two $4,000 certificates were surrendered and canceled, and a new certificate for $8,000 issued to him. On January 16, 1920, the $8,000 certificate was presented at the bank properly indorsed by the payee by Phoebe Henaman, and a new certificate of $8,000 issued, payable to her. At this time, Philip Henaman was ill in bed, and had for some time been unable to look after his business. During the period of his illness, his affairs were conducted by his wife. The only property possessed by either of them was the homestead in which they resided, the funds on deposit in the bank, which included, in addition to the certificates referred to, a small checking account, some stock, and a note signed by two of the sons.

In August, 1920, Phoebe Henaman purchased on 80-acre tract of land near Fostoria, from the appellee D. U. Beving, applying the $8,000 represented by the certificate issued to her January 16, 1920, in payment thereon. The consideration for the purchase was $24,000. The balance, over and above the cash payments of $2,500 made when the contract was executed, and $6,500 the following March, was evidenced by notes and mortgages aggregating $15,000, given to secure the payment thereof upon the land. Upon her failure to pay the interest upon the mortgages in May, 1922, Beving commenced an action in the district court of Clay County, to foreclose the mortgages upon the land. Phoebe Henaman was unable, because of the depreciation in the value of the land and in the prices of farm products, to either pay the mortgages or redeem the property

from execution sale. In this situation, she visited her son Elmer, who resided at Armstrong, Iowa. Learning from her, as he claims for the first time, of the application by his mother of the funds in the bank to the purchase of the farm, he procured himself to be appointed administrator, and commenced this action against the Citizens Savings Bank, Vernon Clark, its cashier, Phoebe Henaman, and D. U. Beving, the mortgagee, to recover all of the funds received by Phoebe Henaman from the bank and applied by her upon the purchase price of the farm, upon the theory that the same were assets of the estate of Philip Henaman, with which the parties named had intermeddled, in violation of Section 3407 of the Code of 1897, which is as follows:

"Any person who, without being regularly appointed as executor or administrator, intermeddles with the property of a deceased person, is responsible to the regular executor or administrator, when appointed, for the value of all property taken or received by him, and for all damage caused by his acts to the estate of the deceased."

Conspiracy to defraud Phoebe Henaman and the estate of her husband by the officers of the bank and Beving is also charged. Other sums than the $8,000 were involved in the court below; but judgment was entered against the bank for the amount thereof found due the administrator, from which no appeal has been taken. We therefore give this judgment no further consideration. There is no dispute in the record as to any of the matters stated above. There is, however, considerable conflict in the testimony of the witnesses called on behalf of the respective parties, as to other material matters.

In explanation of the transaction of January 16, 1920, at the bank, when the certificate of deposit for $8,000 payable to Philip Henaman was surrendered, and a new one issued, payable to Phoebe Henaman, she testified as follows:

"I took the certificates in there, and Mr. Clark says, 'Why don't you put these in your name?' and I says, 'Would that be all right?' and he says, 'Yes, that would be all right;' and he started to fill out the certificates; and I said, 'No, you had better not put that in my name;' and he said, 'Well, he can have it changed back any time.' I did not say anything to him at that time about wanting it put in my name. I relied on his

suggestion that it would be all right to put it in my name. I made no suggestion to him in any way in that conversation that I wanted it put in my name.''

Vernon Clark, cashier of the bank, denied the truth of the above testimony, and gave his version of the transaction as follows:

''I remember of Mrs. Henaman, bringing in the certificate Exhibit C, and issuing at that time the $8,000 certificate Exhibit E. Q. Do you remember what Mrs. Henaman said to you at that time? A. She said, 'I brought this certificate in, and I want the interest put on our checking account, and the new certificate made out in my name.' Q. Did you say to her at that time, in substance or effect, that she should have it made in her name, or she might as well have it made in her name, or that you, if they wanted to change it, you would change it? Was there any talk of that kind? A. No, there was not. Q. Was that all that was said about it,—what you have just related,—that she said she wanted it made in her name? A. Yes, sir.''

This witness further testified that, previous to this date, he had a conversation with Philip Henaman concerning the authority of Phoebe to transact his business at the bank for him. Concerning this conversation, he testified as follows:

''A. He told me that she would have authority to take charge of his business and to sign checks and sign his name or her name and to renew his deposits from time to time, and says that she could take the—transfer the money over in her own name, as she saw fit, and whatever she said and done, he said would be all right. * * * Yes, sir, he said that; he asked me if it would be all right to have her take charge of his business, and I says, 'Yes, it will, if you give her authority to do so, and give her to sign your checks and transact business for you.' And I asked him how he wanted her to sign her check, and he says, 'It doesn't matter,—she can sign my name or her name, whichever she wants to;' and he says, 'That is what I want to do;' and says, 'There is enough money here to take care of her as long as she lives, if she is careful;' and he says, 'I will give her authority, then, to take charge of my business, and she can sign checks and draw money and renew my certificates of deposit in

my name or her name, and whatever she does will be all right with me.''

Objection was made by appellant to the foregoing testimony, upon the ground that it was incompetent, under Section 4604 of the Code of 1897. The testimony of the cashier as to the transaction on January 16, 1920, is corroborated by his brother, who was present in the bank. It is conceded that Mrs. Henaman came into the bank alone. The funds in question remained in the bank, as stated, until August, 1920, when Phoebe Henaman purchased the 80-acre farm from Beving. Beving had listed the farm for sale with Vernon Clark, and also with one Groszkruger, cashier of another bank in Fostoria, agreeing to pay a commission of $400 for the sale of the land. On or about the 13th of August, 1920, Vernon Clark took Phoebe Henaman, accompanied by her two sons, Charles and Foster, who were of age, to look at the farm. After making some inspection of the premises, they returned to the bank; and a contract of sale was prepared by Clark and signed by Beving and Mrs. Henaman. A cash payment of $2,500 was made on that date, and a further sum of $6,500 on March 1st following, when the papers were exchanged, as we understand the record. Phoebe Henaman testified that she purchased the farm in reliance upon the statements and representations of Clark, with whom she was well acquainted, as to its value, and denied that she consulted anyone else concerning the purchase of this or other land. Her testimony as to the latter statement is contradicted by other witnesses, some of whom, at least, could have had little, if any, interest in this controversy.

The commission paid by Beving was divided between Clark and Groszkruger, who claimed, and also testified, that Mrs. Henaman previously talked to him about buying the Bennett farm. Beving testified to the same effect. Other witnesses recalled conversations with her concerning the purchase of land, and at least two testified that they sought to discourage the purchase of the Beving tract. Mrs. Henaman also testified that the contract was written by Clark, and that she was told to sign it, without having familiarized herself with its contents. Clark contradicted this testimony; and testified that at least two of her sons were present on the occasion. The mother claimed that

the boys left the bank before the contract was executed. Evidence was introduced as to the value of the farm. The witnesses for appellant fixed the value thereof at from $200 to $250 per acre, at the time of the sale.

We find nothing in the record tending in any substantial way to establish conspiracy or fraud on the part of any officer of the bank or of Beving in the sale of the land.

If we assume that the transaction was as claimed by Clark, the cashier, is it not clear that appellant cannot recover against the bank? The possession of the certificate of deposit, properly indorsed by Philip Henaman, was prima-facie authority to the bank to pay the amount represented thereby to Phoebe Henaman, or to issue her a certificate in her own name, if demanded by her. On the other hand, if the transaction was as claimed by appellant, it could not then constitute intermeddling with the property of an intestate. On the date of Philip's death, Phoebe held a certificate of deposit payable to her. The only direct evidence of her authority to transact the business of her husband in her own name is that of Clark, the competency of which is very doubtful. It is true that it was elicited on cross-examination, while Clark was on the stand as a witness for appellant; but it was hardly proper cross-examination. It has been frequently held that color of title to property is sufficient to protect from liability a person dealing with an executor *de son tort*. *Walker v. Portland Sav. Bank,* 113 Me. 353 (93 Atl. 1025, Ann. Cas. 1917-E 1, and note); *Grace v. Seibert,* 235 Ill. 190 (85 N. E. 308).

Phoebe Henaman at no time assumed to act in the capacity of an administrator of her husband's estate, but dealt with the funds in controversy as her own. Of course, appellant answers this proposition with the contention that the cashier knew that the money belonged to the estate of her deceased husband, and not to her. The preponderance of the testimony, if full credit is given to all of the witnesses as to what occurred at the time the new certificate was issued, sustains the bank's claim. The testimony of other witnesses and circumstances disclosed by the record as a whole add weight to the bank's contention. All of the adult heirs of Philip Henaman, except Elmer and Cyrus B., resided in Fostoria, or in the immediate vicinity thereof. Ap-

pellant and his brother resided at Armstrong and Estherville, respectively. Charles and Foster accompanied their mother when she went with Clark to inspect the farm. All of them knew that the money in the bank had, previous to his illness at least, belonged to their father. None of them, except Elmer, were witnesses upon the trial. They must have known that the cash paid on the purchase price of the farm was withdrawn from the bank, and that it represented the funds formerly the property of their deceased father. Practically two years elapsed before an administrator was appointed, and during this period no one at any time appears to have questioned the right of Mrs. Henaman to use the money. On the contrary, at least Charles and Foster participated with her in the inspection of the land, and made no objection to the purchase thereof by her, or to the manner in which the consideration was paid. Aside from their conduct's constituting an equitable estoppel, which is not binding on the minors, the evidence thereof is significant, as bearing upon the understanding which the adult heirs had of the disposition by their father of the assets of his estate. Elmer testified that he gave the matter no consideration or attention whatever, made no inquiry of his mother, and, although he knew she had purchased the farm, did not know that she had used the money in the bank for that purpose.

Mrs. David Shatto, a sister of Philip Henaman's, testified that, on the day arrangements were made for the funeral of her brother, she heard Elmer and his mother discussing the purchase of a casket; that the mother said to him, "We ought to be careful of the money;" and that Elmer replied, "No matter about the money,—we are going to give Pa the best there is; and that the money will all be hers as long as she needed it." This witness further testified that, on the day she testified as a witness upon the trial in the court below, Mrs. Henaman and Elmer requested her to say that she did not remember this conversation, or to allow the attorneys to confuse her on cross-examination, so that her testimony would not hurt them. It is true, she admitted that Elmer insisted that the conversation did not occur as she remembered it. The witness was, however, corroborated by the testimony of her husband and her daughter, Mrs. Snyder. The two witnesses last named further testified that

Dan and Foster Henaman were present, and participated in the conversation. Neither took the stand to deny it. Mrs. Henaman denied that the conversation testified to by Mrs. Shatto occurred, and also denied the conversation at the home of her sister-in-law during the trial. Mrs. Henaman also denied that she talked with anyone about buying the farm in question, or the purchase of a farm at all. Clarence Clark, brother of the cashier of the bank, and Frank Riley, a merchant in Fostoria, testified that she talked to them, and that they advised her not to purchase the farm. D. E. Beving, brother of appellee, and Paul Groszkruger, cashier of the Farmers Savings Bank of Fostoria, and Mrs. Allen, all testified that she talked with them about buying a farm. Mrs. Allen testified that she admitted that the witness Riley had told her, if she wanted to buy trouble, to buy land.

Mrs. Henaman's attitude up to the time this action was commenced was inconsistent with the claim she now makes. She claims, however, that she was acting on the advice of Clark, in whom she had special confidence, and that, but for his interposition and supposedly friendly advice, both as to the right to use the money and the advisability of buying the farm, she would not have made the investment. It seems to us, however, that the preponderance of the evidence sustains the claim of the bank that the transfer of the funds into her name was with authority, and in accordance with the desire of Mrs. Henaman. Surely, the cashier of the bank could have had no reason for advising Phoebe Henaman to have the certificate made payable to her. With this view of the testimony, it is unnecessary to discuss further the statute prohibiting intermeddling with the estates of decedents.

Mrs. Henaman offered to place Beving *in statu quo,* and joined in the demand of the administrator for the return of the payments made on the land. This is not an action for rescission of the contract; and, as already indicated, no sufficient ground therefor is disclosed by the record. In this situation of the record, this court is powerless to relieve Phoebe Henaman of the unfortunate condition in which the improvident purchase of the land placed her.

Without further discussion, it is the conclusion of the court that the judgment and decree rendered below must be, and is,— *Affirmed.*

FAVILLE, C. J., and DE GRAFF and VERMILION, JJ., concur.